# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | I.D. No. 1605008909 |
| | ) | |
| | ) | |
| CECILY JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Submitted: January 5, 2017
Decided: January 13, 2017

*Upon Consideration of Defendant's Motion to Suppress,*
**DENIED.**

Marc C. Petrucci, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware. *Attorney for the State.*

Eugene J. Maurer, Jr., Esquire, and Cynthia L. Ruggiero, Esquire, Eugene J. Maurer, Jr. P.A., Wilmington, Delaware. *Attorneys for the Defendant.*

**MEDINILLA, J.**

**AND NOW TO WIT**, this 13th day of January, 2017, upon consideration of Defendant's Motion to Suppress, the State's response thereto and the testimony offered at the suppression hearing on January 5, 2017, it appears to the Court that:

1.    Defendant Cecily Johnson ("Defendant") is charged with Drug Dealing, Aggravated Possession, Possession of Drug Paraphernalia, and Conspiracy Second Degree.    Defendant was arrested on May 12, 2016 upon meeting with a confidential source ("CS").    The CS was arrested earlier that same day and provided information to police that lead to Defendant's arrest.

2.    On May 12, 2016, after the CS's arrest, the CS identified "a light skin black female, who the CS knows only as 'Candy,' as a marijuana source of supply."[1]    The CS knew Candy because the two were involved in an earlier romantic relationship.    After their relationship ended, the CS and Candy continued to engage in regular drug transactions.    The CS also indicated to police several other aspects of Candy's alleged drug operation.    For instance, Candy and her associates reportedly obtained between 100-200 pounds of marijuana through freight shipments.    Additionally, the CS identified her phone number and the vehicles that she used to conduct drug transactions.    These vehicles were a maroon Lexus and a silver/gray Infinity.    The CS further identified the area where Candy lived and the location where the CS usually met with Candy to purchase drugs: a

---

[1] DEA Report at 1 (attached as Ex. A to Defendant's Motion).

parking lot at Becks Pond in Newark, Delaware. With the CS's information and cooperation, members of the Wilmington Residence Office DEA, including Task Force Officer Paul Lawrence and Resident Agent David Hughes, decided to engage Candy in a controlled drug transaction with the CS.

3. On May 12, 2016 at 3:30 p.m., the CS made the first of two recorded phone calls to Candy at the behest of Officer Lawrence and Resident Agent Hughes.[2] When Candy answered the call, the CS told her that the CS "had some bread on [the CS's] bill."[3] Officer Lawrence, present for both recorded calls, testified that this terminology meant that the CS had money to pay off an outstanding debt to Candy.[4] The CS then asked if everything was "cool." Candy replied affirmatively. Both Officer Lawrence and Resident Agent Hughes testified that, based on their training and experience, this dialogue was code for whether Candy was prepared to conduct another drug transaction. At that time, however, Candy could not meet because she did not have access to either of her vehicles and the call ended with a tacit understanding that they would speak later about

---

[2] *See* Defendant's Motion at ¶ 3. *See also* State's Ex. 1 (recording of first phone call). Officer Lawrence and Resident Agent Hughes were called as the State's witnesses at the suppression hearing.

[3] *See* Defendant's Motion at Ex. B (transcript of recorded conversation).

[4] Officer Lawrence and Agent Hughes also testified that they had confirmed the fact that the CS owed Candy money before engaging Candy in the first phone call.

3

arranging a meeting when Candy had access to a car. During this first phone call, no explicit drug transaction was arranged.[5]

4.      Officer Lawrence and Resident Agent Hughes had earlier confirmed that the CS normally purchased three to four pounds of marijuana from Candy. Accordingly, when the CS made the second recorded call to Candy at 6:20 p.m, the CS asked Candy to sell the CS a "*tres* or a four." The officers testified that this was slang for "three or four" pounds of marijuana. The CS asked where Candy wanted to meet. Candy stated, "By the pond." The phone call ended with an understanding that Candy would call when she could meet with the CS.

5.      DEA Wilmington Resident Office officers, including Officer Lawrence and Resident Agent Hughes, then arranged surveillance at the parking lot at Becks Pond following the second call. The CS accompanied the officers in the CS's vehicle.[6] At 7:09 p.m., while the officers were with the CS, Candy called to inform the CS that she was arriving at the parking lot. Special Agent Joseph Rosati simultaneously radioed to Officer Lawrence that he observed a silver/gray Infinity with a person matching the description of Candy entering the lot at that time.

---

[5] *See* Defendant's Motion at ¶ 3. Both Officer Lawrence and Resident Agent Hughes further testified that the drug terminology used during the two phone calls implied that a transaction was contemplated. *See* State's Response at 6.

[6] Prior to the controlled transaction, officers with the DEA Wilmington Resident Office searched and seized any contraband and currency in the CS's vehicle per departmental policy.

6. At 7:11p.m., the CS was instructed by the officers to meet with Candy. Officer Lawrence, trailing the CS to the meeting place, parked across the street from the entrance to the parking lot. At 7:15 p.m., Officer Lawrence and the other stationed officers observed the CS arrive in the CS's vehicle and park next to the silver/gray Infinity. At no time did the officers lose sight of the CS's vehicle. Officer Lawrence then radioed the other officers to arrest Candy, who was later identified as Defendant.[7]

7. A search incident to arrest of Defendant's vehicle revealed in plain view a cloth bag on the backseat clearly showing the presence of marijuana. The search also uncovered a purse containing several credit card statements to "Cecily Johnson;" an address of 2419 Porter Road, Bear, Delaware; a set of house keys and statements to Marvin Knight; and a gray cell phone. This phone matched the number dialed in the two earlier recorded phone calls.

8. Defendant has moved to suppress the evidence from the search of her person and automobile, filing this Motion on October 27, 2016. The State responded on December 7, 2016. An evidentiary hearing on the Motion was held on January 5, 2017.

---

[7] Resident Agent Hughes testified that the CS was not given money to conduct the drug transaction with Candy and, therefore, for safety reasons, the arrest was made prior to making Candy aware that the CS had no intentions of completing the drug transaction or paying off any owed debt.

9. Pursuant to Delaware Superior Court Criminal Rule 12(b)(2), a criminal defendant may file a motion to suppress the evidence seized by the State prior to trial.[8] Where a Defendant moves to suppress evidence collected in a warrantless search, the burden is on the State to prove the search "comported with the rights guaranteed [to the defendant] by the United States Constitution, the Delaware Constitution and Delaware statutory law."[9] The State has a burden of proving the constitutionality of the search by a preponderance of the evidence.[10] Since the search in this case occurred without a warrant, the State carries the burden of proving the constitutionality of the search by a preponderance of the evidence.

10. Under the Fourth Amendment of the United States Constitution and 11 *Del. C.* § 1904, there must exist "probable cause" that a defendant has committed a crime before officers may make a warrantless arrest of the defendant.[11] Probable cause is a flexible standard and exists where "the facts and

---

[8] DEL. SUPER. CT. CRIM. R. 12(b)(2).

[9] *State v. Preston*, 2016 WL 5903002, at *2 (Del. Super. Sept. 27, 2016) (quoting *State v. Kang*, 2001 WL 1729126, at *3 (Del. Super. Nov. 30, 2001)).

[10] *See id.*

[11] U.S. CONST. amend IV; 11 *Del. C.* § 1904 (2016) (using term "reasonable ground" instead of "probable cause). *See Stafford v. State*, 59 A.3d 1223, 1228 & n.24 (Del. 2012); *Tolson v. State*, 900 A.2d 639, 642-43 (Del. 2006) (defining "reasonable ground" under § 1904 as synonymous with "probable cause.").

circumstances within the arresting officer's knowledge, of which he has trustworthy information, are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed."[12]

11. "Only a fair probability, not a *prima facie* showing, of criminal activity is the standard for probable cause."[13] A reviewing court must apply a case-by-case review of the probable cause determination based on the totality of circumstances presented to the arresting officer.[14] Such a review seeks to weigh "the events leading up to the arrest" from the perspective of an objectively reasonable police officer.[15]

12. "A tip from a confidential informant can provide probable cause, if the totality of the circumstances demonstrates the tip's reliability."[16] In evaluating the tip's reliability, "a court must consider the reliability of the informant, the details contained in the informant's tip, and the degree to which the tip is corroborated by independent police surveillance and information."[17] For instance,

---

[12] *Stafford*, 59 A.3d at 1229 (citing *Tolson*, 900 A.2d at 643).

[13] *Id.* (citing *State v. Maxwell*, 624 A.2d 926, 928 (Del. 1993)).

[14] *See Maxwell*, 624 A.2d at 928 (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

[15] *Stafford*, 59 A.3d at 1229 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

[16] *State v. Holden*, 60 A.3d 1110, 1115 (Del. 2013).

[17] *Brown v. State*, 897 A.2d 748, 751 (Del. 2006).

7

the accurate prediction of future movements adequately corroborates a tip since "[c]orroboration of an informant's tip about a suspect's movements suggests that the informant possesses knowledge of the suspect's criminal behavior, because the informant knows the person well enough to know what they will do."[18] In order to provide law enforcement officers with probable cause, the information provided in the tip must be of the sort that could likely only be known by a person who obtained this information from the suspect directly and that is not easily predicted.[19]

13. Here, the CS clearly exhibited substantial knowledge of Candy and the illegality of her conduct. First, the CS gave an accurate physical description of "Candy," later identified as Defendant, and described the exact vehicles she used in prior drug transactions. The CS identified the area Defendant lives and the approximate location where she meets to transact drug deals. This location was then suggested by Candy as the location where their drug transaction would occur. Additionally, the CS indicated that Candy used vehicles to conduct drug

---

[18] *Holden*, 60 A.3d at 1116.

[19] *See id.* at 245-46. Defendant argues that *LeGrande v. State*, 947 A.2d 1103 (Del. 2008) applies to the facts of this case because the State failed to prove the CS's "tip" was past proven reliable. *LeGrande* involved the sufficiency of an *anonymous* tip regarding contraband the defendant-probationer allegedly stored in his apartment. The Court held that police failed to sufficiently corroborate the tipster's assertion of illegality. *LeGrande* is distinguishable from the facts of the present case. Here, the CS was not an anonymous tipster; rather, the CS was known to officers, exhibited substantial knowledge about Candy and her alleged conduct, and cooperated with officers through the entirety of their investigation into Candy leading up to her arrest.

transactions. One of the vehicles the CS identified, a gray Infiniti, was the vehicle Defendant drove to the meeting at the parking lot.

14. Defendant argues that no explicit drug transaction was contemplated in the two recorded conversations. However, while the CS and Defendant did not explicitly state such a transaction would occur, they used recognized drug slang to plan their transaction. For instance, Resident Agent Hughes testified that they corroborated the quantity of drugs the CS previously purchased from Candy. This same slang terminology was used by the CS, and repeated by the Defendant in the second recorded conversation.

15. Importantly, the CS and Candy had a prior romantic relationship and a history of engaging in drug transactions. Officer Lawrence testified that their familiarity with one another meant no explicit arrangement of the transaction on the phone was necessary. Not only was it not necessary, but it would be uncommon to see a drug deal spelled out with any specificity, as coded language is often used in drug exchanges.

16. Further, the CS's information was deemed reliable and corroborated when Defendant arrived as stated at the parking lot at the approximate time arranged during Candy's phone call to the CS, Defendant matched the CS's physical description of Candy, and she drove the same gray Infiniti identified by the CS.

17.    This Court finds there was sufficient probable cause to arrest Defendant based on the evidence presented.    A reasonably prudent officer, knowing the information available to the officers, would have sufficient information to form an understanding that there existed a fair probability that Defendant had or was about to commit the offense of Drug Dealing.

For these reasons, the evidence seized from Defendant will not be suppressed as the fruits of an unlawful search and seizure.    Defendant's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED.**

Vivian L. Medinilla
Judge

oc:    Prothonotary
cc:    Defendant
       Marc C. Petrucci, Esquire
       Eugene J. Maurer, Jr., Esquire
       Cynthia L. Ruggiero, Esquire
       Investigative Service Office